**James CONSTANT, Plaintiff–Appellant,**

v.

**ADVANCED MICRO–DEVICES, INC., Gould, Inc., American Microsystems, Inc., Analog Devices, Inc., Fujitsu, Ltd., Fujitsu Microelectronics, Inc., Digital Switch, Inc., Granger Associates, Inc., Hitachi Corporation, Intel, Inc., Interactive Circuits & Sys. Ltd., Matshushita Electronics Corp., Computer Modules, Inc., Nippon Electric Co., Ltd., NEC Electronics USA, Paradyne Corporation, Semiconductor Products, Texas Instruments, Inc. and TRW, Inc., Defendants–Appellees.**

No. 88–1101

United States Court of Appeals, Federal Circuit.

June 9, 1988.

James Constant, pro se.

Jerry R. Selinger, Baker, Mills & Glast, Dallas, Tex., for defendant-appellee Texas Instruments, Inc.

Adrian M. Pruetz, Morrison & Foerster, Los Angeles, Cal., for defendants-appellees, Fujitsu, Ltd. and Fujitsu Microelectronics, Inc.

Martin R. Horn, David M. Simon and David A. Hall, Spensley Horn Jubas & Lubitz, Los Angeles, Cal., for defendant-appellee, Hitachi America, Ltd.

Edwin H. Taylor and James C. Scheller, Jr., Blakely, Sokoloff, Taylor & Zafman, Sunnyvale, Cal., for defendants-appellees Advanced Micro–Devices, Inc. Intel Corp.

Before DAVIS and SMITH, Circuit Judges, and COWEN, Senior Circuit Judge.

DAVIS, Circuit Judge.

Appellant Constant has raised a large number of separate and diverse issues on appeal. The appealed decisions and rulings of the United States District Court for the Central District of California are all affirmed.

## DISCUSSION

In January 1985, appellant James Constant sued a large group of high technology companies for infringements of his United States Patents Nos. 3,950,635 (the '635 patent) and 4,438,491 (the '491 patent). The complaint also contained nine counts involving other theories of recovery and included challenges to the constitutionality of 35 U.S.C. § 282 and of federal funding of research and development. The district court (Hon. Pamela A. Rymer) dismissed all counts except the infringement claim (Count V) for failure to state claims upon which relief could be granted, and later denied several motions by Constant attempting to revive the dismissed claims.

The defendants filed counterclaims for declaratory relief asking to have the patents declared invalid, unenforceable and not infringed. The case was transferred to the Hon. Steven V. Wilson on December 16, 1985. In August 1986, Judge Wilson, with the agreement of all parties, appointed a Special Master, Robert E. Hillman, to make recommendations to the court concerning motions for summary judgment on issues of patent invalidity. After the special master issued recommendations concluding that the patents are invalid, Constant moved to disqualify the special master and to strike his report. The court ruled against these motions after hearings during which Constant was given a special opportunity to question the master. The court independently determined that there were no material issues of contested facts and entered a summary judgment declaring the claims of the two patents to be invalid under 35 U.S.C. §§ 102(b) and 103.

Constant now appeals the judgments of invalidity, the dismissal of his constitutional claims, the appropriateness of a summary judgment, the role and conduct of the special master, and several procedural rulings of the district court. Because of appellant's earnest efforts to support his positions, we deal with them in greater detail than their merits deserve.

### I. *Constitutional Issues*

■ Appellant challenges the constitutionality of 35 U.S.C. § 282, which (among other things) permits the federal courts to adjudicate the validity of patents when invalidity is raised as an affirmative defense in infringement suits [1].[1]. His argument is based on the wording of the Patent and Copyright Clause of the Constitution, U.S. Const. art. I, § 8, cl. 8, which states that

---

1. Numbers in brackets refer to appellant's listing of the issues on appeal, as enumerated in Brief for Appellant, pp. 8–10.

Congress shall have the power to "promote the Progress of ... useful Arts, by securing for limited Times to ... Inventors the exclusive Right to their ... Discoveries." Appellant construes the word "securing" to require that a patent issued by the Patent and Trademark Office (PTO) must be "secure," i.e. conclusively valid and unchallengeable.

 This novel interpretation is obviously erroneous. Since the adoption of the first Patent Act in 1790, Congress has permitted judicial review of the validity of patents.[2] The courts, the interpreters of the meaning of the Constitution, have consistently construed the Patent and Copyright Clause to permit judicial review of patents. *See Graham v. John Deere Co.,* 383 U.S. 1, 8–10, 86 S.Ct. 684, 689–90, 15 L.Ed.2d 545, 148 USPQ 459, 462–64 (1966); *Slawson v. Grand Street R.R.* 107 U.S. 649, 652, 2 S.Ct. 663, 666, 27 L.Ed. 576 (1882); *Mast, Foos & Co. v. Stover Mfg. Co.,* 177 U.S. 485, 488–89, 20 S.Ct. 708, 710, 44 L.Ed. 856 (1900). Public policy requires that only inventions which fully meet the statutory standards are entitled to patents. This policy is furthered when the validity of a patent, which was originally obtained in *ex parte* proceedings in the PTO, can be challenged in court. *Lear, Inc. v. Adkins,* 395 U.S. 653, 670, 89 S.Ct. 1902, 1911, 23 L.Ed.2d 610, 162 USPQ 1, 8 (1969).

 "Within the limits of the constitutional grant, the Congress may ... implement the stated purpose of the Framers by selecting the policy which in its judgment best effectuates the constitutional aim." *Graham,* 383 U.S. at 6, 86 S.Ct. at 688, 148

USPQ at 462. *Accord United States v. Dubilier Condenser Corp.,* 289 U.S. 178, 189, 53 S.Ct. 554, 558, 77 L.Ed. 1114, 17 USPQ 154, 158 (1933). Thus, Congress has broad discretion on how to implement the conditions and tests for patentability. *Id.; McClurg v. Kingsland,* 42 U.S. (1 How.) 202, 206, 11 L.Ed. 102 (1843). Nowhere does the Constitution require that the determination of patent validity be vested solely in the PTO (or even that there be a PTO). Congress was fully within its constitutional power when it delegated power to the courts in 35 U.S.C. § 282 to adjudicate the validity of patents in infringement suits.[3] Congress was also within its constitutional powers when it created a reexamination procedure as an additional mechanism for the review of patents. The creation of reexamination did not divest the courts of any power to review patent validity. *See* 35 U.S.C. § 306; *Patlex Corp. v. Mossinghoff,* 758 F.2d 594, 601–02, 225 USPQ 243, 248–50 (Fed.Cir.1985); *In re Etter,* 756 F.2d 852, 857–58, 225 USPQ 1, 3–4 (Fed.Cir.1985). The district court thus had jurisdiction to review the validity of the '635 and '491 patents.

 Appellant also argues that Government sponsorship of research and development is unconstitutional [5]. He objects particularly to Government sponsorship of the research reported in an article by Allen and Westerfield which was found to be prior art against his patents. He advances two constitutional arguments. First, he argues that Government sponsorship of research and development offends the "Science Clause"[4] of the Constitution,

---

2. Judicial review of patent validity was accepted by members of Congress and presidents who were themselves framers of the Constitution. This is strong evidence that they did not intend patents to be unchallengeable in the courts. *Cf., Burrow–Giles Lithographic Co. v. Sarony,* 111 U.S. 53, 56–57, 4 S.Ct. 279, 280, 28 L.Ed. 349 (1884) (Early acts of Congress are evidence of original intent of framers concerning the meaning of the term "writings" in art. I, § 8, cl. 8.).

3. Similarly, Congress has the power to delegate to the courts the power to review decisions of the PTO under 35 U.S.C. §§ 141–145, so that the courts may declare an invention to be patentable after it has been rejected by the PTO. Appel-

lant has appealed decisions of the PTO under 35 U.S.C. § 141, thus recognizing the power of the courts to review decisions of the PTO.

4. The full text of art. I, § 8, cl. 8 is: "[The Congress shall have Power] ... To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." The power to grant patents to inventors is for the promotion of the useful arts, while the power to grant copyrights to authors is for the promotion of "Science," which had a much broader meaning in the 18th Century than it does today. *In re Bergy,* 596 F.2d 952, 958, 201 USPQ 352, 359 (CCPA 1979), *aff'd sub*

which he construes to mean that the only constitutionally permissible means for the Government to promote science is by securing the rights of inventors and authors. This interpretation is likewise erroneous. Art. I, § 8, cl. 8 does not state that the Government may promote the progress of the useful arts *only* through the patent and copyright system. Ample constitutional power for Government funding of research and development can be found in art. I, § 8, cl. 1 (provide for the common Defense and general Welfare), cl. 3 (Commerce), cl. 12 (Army), cl. 13 (Navy) and cl. 18 (necessary and proper clause). It is also settled that art. I., § 8 authorizes Congress to spend money to promote the "general welfare," and that the definition of the general welfare and decisions concerning how to promote it are within the discretion of Congress. *Helvering v. Davis*, 301 U.S. 619, 640, 57 S.Ct. 904, 908, 81 L.Ed. 1307 (1937); *Buckley v. Valeo*, 424 U.S. 1, 90–91 (1976). Government support for research and development is well within this discretionary power.

■ Appellant charges that he has been deprived of liberty and property without due process in violation of his 5th and 14th amendment rights in several contexts [5, 7, 10, 11]. He fails to point to any legally recognized liberty interest of which he has been deprived. The court below has invalidated his patent property interest, but the legal proceedings in which he participated fully provided the constitutionally required degree of due process. There may be debate as to the full meaning of "due process," and the courts have struggled to define its boundaries and requirements within the context of nonjudicial governmental action. *E.g., Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). However, it is unambiguously clear that federal judicial proceedings, with their extensive notice, opportunity to be heard, and procedural protections, satisfy the constitutional requirement of procedural due process required for the invalidation of a patent. Constant has failed to demonstrate

*nom. Diamond v. Chakrabarty*, 447 U.S. 303, 100 S.Ct. 2204, 65 L.Ed.2d 144, 206 USPQ 193

any legally cognizable deprivation of due process. On the contrary, the district court went to great lengths to give his claims a full and fair hearing.

Appellant tried to reargue these constitutional arguments in his motions for declaratory judgment [11]. The district court properly dismissed these motions for procedural defects. Plaintiff should understand that, had these motions been considered on the merits, he would have lost for the reasons stated in this opinion.

## II. *Dismissal of Noninfringement Claims*

■ The district court dismissed Counts I–IV and VI–X for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6) [10]. These counts alleged a variety of causes of action including deprivation of civil rights, constitutional rights, and antitrust violations. The dismissals were correct on several grounds. A dismissal for failure to state a claim is proper where it appears beyond doubt that plaintiff can prove no set of facts which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Stanspec Co. v. American Chain & Cable Co.*, 531 F.2d 563, 566, 189 USPQ 420, 422 (CCPA 1976). Appellant's objections appear to center mainly on his assertions that he can and is entitled to prove the facts asserted in the complaint. However, the court found that those facts, even if true, would not entitle appellant to relief from the court. The court determined that each of his claims lacks some element that would be necessary to entitle him to legal relief. We have considered the reasoning for the dismissal of each count set forth in the Tentative Ruling appended to the court's order of July 2, 1985, and see no legal error.

There are also numerous additional legal grounds supporting dismissal. For example, appellant cites *United Brotherhood of Carpenters v. Scott*, 463 U.S. 825, 103 S.Ct.

(1980).

3352, 77 L.Ed.2d 1049 (1983), to argue that his Count II ("Civil Rights/Patent Law") meets the criteria for a cause of action under 42 U.S.C. § 1985(3) ("Conspiracy to interfere with civil rights"). On the contrary, the holding in that case is that conspiracies based on economic or commercial animus, like those which appellant alleges, are beyond the reach of § 1985(3). *Id.* at 839, 103 S.Ct. at 3361. The district court correctly noted that appellant also failed to establish the requisite state action or class-based discriminatory animus.

In addition to the defects requiring the dismissal of individual counts, appellant has conceded that each of the nine dismissed counts depends inextricably on his theories concerning the unconstitutionality of 35 U.S.C. § 282 and of federal support for research and development. Since these constitutional theories are without merit, appellant could not prevail on any cause of action that depends upon them even if the facts stated in the complaint were true. Thus, dismissal of the nine counts under Rule 12(b)(6) was warranted.

### III. *The Special Master*

Appellant argues that the use of a special master deprived him of his right to a jury trial [2]. He also challenges the qualifications of the special master and charges that the latter "suppressed" and misinterpreted evidence [3]. Constant contends that the district court erred in refusing to grant his motions to disqualify the master and strike the master's recommendations.

The federal courts have the inherent power to appoint persons unconnected with the court to aid judges in the performance of specific duties. *Ex parte Peterson,* 253 U.S. 300, 312, 40 S.Ct. 543, 547, 64 L.Ed. 919 (1920). *See Ruiz v. Estelle,* 679 F.2d 1115, 1161 n. 240 (5th Cir. 1982). Although here the parties agreed to the appointment of a master, the court has the power to appoint masters without the consent of the parties. *Peterson,* 253 U.S. at 312–14, 40 S.Ct. at 547–48. Reference of issues to a master, even compulsory reference, does not violate the 7th Amendment right to trial by a jury to which a master's

findings may be read under Rule 53(e)(3). *Crateo, Inc. v. Intermark, Inc.,* 536 F.2d 862, 868 (9th Cir.), *cert. denied,* 429 U.S. 896, 97 S.Ct. 259, 50 L.Ed.2d 180 (1976); *Peterson,* 253 U.S. at 309–12, 40 S.Ct. at 546–47. Masters can properly aid the court in evaluating issues of patent validity and infringement in the context of motions for summary judgment, and have often done so. *Milliken Research Corp. v. Dan River, Inc.,* 739 F.2d 587, 222 USPQ 571 (Fed. Cir.1984); *D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 219 USPQ 13 (Fed.Cir.1983). *See* Williams & Thierstein, *Use of Masters in Litigation,* 12 AIPLA Q.J. 227, 237–43 (1984).

The powers and conduct of special masters are generally governed by Fed.R.Civ. P. 53, and the specific powers of the master are defined by the order of reference in each particular case. Rule 53(c). Judge Wilson's order of May 16, 1986 empowered the master to review the submissions of the parties, hold hearings and make recommendations on the motions for summary judgment as to the issues of invalidity and non-infringement that were before the court. All actions of the master were properly within the limits of that order of reference.

Appellant agreed to the appointment of the master and participated in hearings and presentation of evidence to the master. It was only after the master issued recommendations unfavorable to the appellant that the latter objected to the use of the master. A party cannot wait to see whether he likes a master's findings before challenging the use of a master. Failure to object in a timely fashion constitutes a waiver. *Spaulding v. Univ. of Wash.,* 740 F.2d 686, 695 (9th Cir.1984); *Hill v. Duriron Co.,* 656 F.2d 1208, 1213 (6th Cir.1981); *Hayes v. Foodmaker, Inc.,* 634 F.2d 802 (5th Cir.1981). There was no abuse of discretion in the district court's denial of appellant's motion to disqualify the master. *Macri v. United States,* 353 F.2d 804 (9th Cir.1965). The court also acted within its discretion in refusing to allow the appellant to attack the qualifications of the master during a special hearing that was held to

allow the appellant to question the master on the merits of the recommendations.

 We also note that from the record Mr. Hillman appears to be very well qualified to serve as a master in this case. Appellant Constant is wrong in presuming that a master need have the same expertise in the technology as the inventor. Where complicated issues of patent law are involved, the appointment of an experienced patent attorney is quite appropriate. The charges that the master misinterpreted and suppressed evidence are wholly unjustified.

### IV. *Summary Judgment*

 Appellant complains that the summary judgment against him impermissibly shifted the burden of proof by requiring him to come forward during discovery with evidence of validity [8], thus depriving him of the procedural advantage that derives from the presumption of validity in 35 U.S.C. § 282. *Stratoflex, Inc. v. Aeroquip Corp.,* 713 F.2d 1530, 218 USPQ 871 (Fed. Cir.1983). On the contrary, appellees met their burden of proceeding first and their burden of persuasion in connection with their motions for summary judgment. Appellees were entitled to use of discovery of the appellant in support of their motion for summary judgment, and this did not shift the burden of first-proceeding to Constant.

Appellant failed to create a summary judgment record that raised any genuine issue of material fact that would render summary judgment inappropriate. *Hodosh v. Block Drug Co.,* 786 F.2d 1136, 1141, 229 USPQ 182, 186 (Fed.Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986). *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Chore–Time Equip., Inc. v. Cumberland Corp.,* 713 F.2d 774, 778, 218 USPQ 673, 675 (Fed.Cir.1983). It is established that there is no right to a jury trial where there are no issues of fact to be tried by the jury, and that a proper summary judgment does not violate the 7th Amendment. *Poller v. Columbia Broadcasting Sys. Inc.,* 368 U.S. 464, 82 S.Ct.

486, 7 L.Ed.2d 458 (1962); *Fidelity & Deposit Co. of Md. v. United States,* 187 U.S. 315, 320, 23 S.Ct. 120, 122, 47 L.Ed. 194 (1902); *Peterson,* 253 U.S. at 310.

### V. *Validity of the '491 Patent*

The purpose of the invention in the '491 patent is to provide integrated circuit chips that can be interconnected in a computer with fewer wires (leads). The wires that interconnect chips must be attached at bonding pads, which are metallic areas on the chip that take up a relatively large amount of space that might otherwise be used for logic circuitry. The invention is based on eliminating some prior art pads and leads and using the areas vacated to incorporate on-chip means for transmitting and receiving signals (transceivers). For example, the patent states that the receiver means can be implemented on the chip as an analog-to-digital (A/D) converter and that the transmitter means can be implemented on the chip as a digital-to-analog (D/A) converter. The interconnections between chips may then be reduced because a single analog voltage on a single wire can represent the same value that would require several wires to transmit in digital form as binary 0's and 1's.

The '491 patent contains thirty claims. Many of the claims differ from others only in using different kinds of transceivers instead of A/D converters (e.g. modems, light emitting diode/photodetector) or in using different means instead of wires for interconnecting the chips (e.g., optical, acoustical, electromagnetic). These transceiver and interconnecting means are all in the prior art, as are the monolithic (i.e., on a single chip) integrated circuits used in the invention. The claimed novel invention is the use of transmitter and receiver means on a chip in order to transform incoming and outgoing signals so as to reduce the number of pads on a chip and the number of interconnecting leads between chips.

Appellant sued appellee Intel Corporation (Intel) charging that Intel's 2920 IC chip infringed the '491 patent.[5] The 2920 is

---

5. Constant wrote Intel stating that the 2920 Sig-

nal Processor infringed claims 1, 7, 8, 9, 16, 18

a single chip microcomputer in which an on-chip A/D converter converts an incoming analog signal into digital form, processes the digital data using programmable on-chip digital processors and then transforms it into an analog output signal through an on-chip D/A converter. (The 2920 also has additional capabilities such as sample-and-hold circuits for the input and output.)

Appellant filed his application for the '491 patent with the PTO on October 14, 1980. Therefore the critical date, for purposes of a 35 U.S.C. § 102(b) (statutory bar via prior description, use, or being on sale), is October 14, 1979. There is uncontroverted evidence, and Constant has conceded, that the 2920 was on sale before the critical date. Intel moved for a summary judgment on the basis that these earlier sales anticipate and invalidate the asserted claims under § 102(b).

Constant apparently conceded that the 2920 embodied the other elements of the claims in the patent, but defended that the preamble of the claims was not anticipated by the 2920. The preamble of claims 1, 18, and 23 through 28 is in Jepson format, and reads: "In a computer with monolithic IC chips interconnected for data transfers, the improvement to reduce the number of interconnections between chips including: [remaining claim elements]." Constant's argument was that sales of the 2920 before the critical date did not anticipate the claimed invention since the chips were not sold interconnected with other chips in a computer.

Intel responded that the Jepson format preamble should not be considered to be part of the claims, and that sale of the 2920 chips alone was anticipatory. Intel also submitted publications about the 2920 that had been distributed to the public before the critical date—arguing that these publications anticipated all of the involved '491 claims including the preamble. The district court decided, for purposes of the motion for summary judgment, to resolve all

doubts in favor of Constant and to assume that anticipation of the preamble was necessary and that the sale of 2920 chips alone did not anticipate the preamble. The court therefore examined the publications to determine whether they fully anticipated the claims in issue including the preamble. The court also considered, in light of the materials submitted, whether the claims in issue or any of the remaining claims in the patent would have been obvious under 35 U.S.C. § 103. The special master was appointed to assist the court in reviewing submissions and to issue recommendations on these questions.

The court held that certain publications submitted by Intel fully anticipated all elements of claims 1, 7, 8, 9, 16, 18, 21, 22 and 23 of the '491 patent, including the preamble, and that those claims were therefore invalid under 35 U.S.C. § 102(b). The court determined that all remaining claims of the '491 patent, which involved substitution of different transceiver or interconnection means, would have been obvious to one having ordinary skill in the art, and were thus invalid under 35 U.S.C. § 103.

■■■■■ The court found that the claims 1, 7, 8, 9, 16, 18, 21, 22 and 23 (including their preambles) were fully anticipated by Exhibit 5, which is a specification sheet for the 2920 that was distributed to the public by Intel in September 1979. Appellant argues that Exhibit 5 was not a printed publication for purposes of the § 102(b) bar [4] because there is no evidence in the record to prove that it was actually received by the public before October 14, 1979. The statutory phrase "printed publication" has been interpreted to mean that before the critical date the reference must have been sufficiently accessible to the public interested in the art; dissemination and public accessibility are the keys to the legal determination whether a prior art reference was "published." *In re Hall*, 781 F.2d 897, 899, 228 USPQ 453, 455 (Fed.Cir.1986); *In re Wyer*, 655 F.2d 221, 226–27, 210 USPQ 790, 794–95 (CCPA 1981). Intel presented ex-

---

and 23 of the '491 patent and demanding that Intel take a license. It is these claims, plus claims 21 and 22, that were later found to be

invalid because of anticipation by the allegedly infringing 2920 chip and its related publications.

tensive uncontroverted evidence of business practice that was sufficient to prove that Exhibit 5 was widely available and accessible to the interested public before October 14, 1979. Evidence of routine business practice can be sufficient to prove that a reference was made accessible before a critical date. *In re Hall,* 781 F.2d at 899, 228 USPQ at 455. Accessibility goes to the issue of whether interested members of the relevant public could obtain the information if they wanted to. If accessibility is proved, there is no requirement to show that particular members of the public actually received the information.

■ A printed publication must also be enabling. *In re Donohue,* 766 F.2d 531, 533, 226 USPQ 619, 621 (Fed.Cir.1985). Constant argues that Exhibit 5 was not enabling [4] because it does not describe a computer program to make the 2920 operational. He contends that in 1979 the 2920 was a novel, sophisticated chip which required a new hardware and software package to program, and argues that one having only ordinary skill in the art would not be able to program and use the 2920. However, Intel has presented uncontroverted evidence that the SP20 kit for programming the 2920 chip was available to the public and on sale before the critical date. Moreover, specific computer programs are irrelevant to the claimed invention. The specification of the '491 patent does not disclose any specific computer programs and does not suggest that a computer program is part of the invention. Such programs are not elements of the claims of the '491 patent. The claims all concern hardware configurations. The disclosure in Exhibit 5 is at least at the same level of technical detail as the disclosure in the '491 patent. If disclosure of a computer program is essential for an anticipating reference, then the disclosure in the '491 patent would fail to satisfy the enablement requirement of 35 U.S.C. § 112, First ¶.

Constant also argues that Exhibit 5 fails explicitly to disclose a reduction in the number of interconnections between chips, as required by the preamble of the claims. The district court found that reduction in the number of interconnections is inherent in the descriptions of applications for the 2920 described in Exhibit 5. In sum, there was no error in the district court's conclusion that Exhibit 5 was an enabling printed publication.

■ The court concluded that all remaining claims of the '491 patent would have been obvious to one having ordinary skill in the art under 35 U.S.C. § 103. In analyzing obviousness, the court considered the factors required by *Graham. See Custom Accessories, Inc. v. Jeffrey–Allan Indus. Inc.,* 807 F.2d 955, 958, 1 USPQ2d 1196, 1197 (Fed.Cir.1986). The court relied on the publications submitted by Intel and also on Constant's own statements submitted to the PTO during prosecution, to the effect that all of the substitutions "can be made without undue experimentation by the routineer" with the help of prior art references that he cited. Constant's main argument is that because the 2920 was so novel and sophisticated, the level of skill needed to program it and to substitute transceiver and interface means was so high that it was beyond the ordinary skill in the art. However, Constant's own admission during prosecution that this could be accomplished by the routineer is strong evidence to the contrary, and is binding upon him. The district court's findings were not erroneous, and the conclusion that the remaining claims would have been obvious is not incorrect.

## VI. *Validity of the '635 Patent*

■ The '635 patent describes a digital signal processor for comparing two electrical signals, either as a correlator (where both signals are changing) or as a matched filter (where one of the signals is a fixed reference signal stored in a memory device). Correlators and matched filters that used shift registers to store the input and reference signals were known in the prior art. Appellant's invention uses random access memory (RAM) devices instead of shift registers to store the input and reference signals. Appellant conceded in the specification of the '635 patent that everything described in the patent was prior art

technology except the use of RAMs (with the required associated circuitry for addressing the memory) instead of shift registers. A statement in a patent that something is in the prior art is binding on the applicant and patentee for determinations of anticipation and obviousness. *In re Nomiya*, 509 F.2d 566, 571 n. 5 [sic], 184 USPQ 607, 611 n. 4 (CCPA 1975).

Constant filed an application for the '635 patent on June 17, 1974, and the patent issued on April 13, 1976. Prior art publications submitted by the appellees included an article by Allen and Westerfield published in 1964 and U.S. Patent No. 3,295,107 issued in 1966 (the Stalcup patent). The court found that each of these references individually disclosed all of the elements in claims 1, 2, 6, 8, 9, and 11–14 of the '635 patent, and that the Allen and Westerfield article also disclosed each and every element of claim 7. These claims were therefore held to be invalid under 35 U.S.C. § 102(b).

The court also examined whether any claims of the '635 patent would have been obvious under 35 U.S.C. § 103. An article published by Springer in September 1973, suggested using RAMs in place of shift registers in a variety of applications. The Springer article falls short of disclosing the subject matter of claim 1 only in that, while it recommends the general substitution of a RAM for a shift register, it does not specifically disclose a correlator or matched filter. Constant admitted that he read the Springer article, and that it taught him to substitute RAMs for shift registers and led him to conceive the inventions in the '635 patent.

The district court examined the factual considerations required by *Graham*, 383 U.S. at 17–18, 86 S.Ct. at 694, 148 USPQ at 467 based on undisputed material facts. The scope and content of the prior art and the differences between the claims at issue and the prior art were ascertained using the submitted documents. Judge Wilson accepted Constant's own statement that the level of ordinary skill in the art would be an individual having a Ph.D. in electrical engineering or physics. The court concluded that there was no objective evidence of nonobviousness sufficient to create a genuine issue of material fact. *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562–63, 4 USPQ2d 1793, 1795–96 (Fed.Cir.1987). The court then considered the claimed invention as a whole and found that all of the claims in the '635 patent would have been obvious to one having that level of skill in the art—considering the Springer article, the Allen and Westerfield article, and the Stalcup patent. The court ruled that obviousness had been established by clear and convincing evidence sufficient to overcome the presumption of validity attaching to a patent under 35 U.S.C. § 282.

▇▇▇▇ Appellant raises a variety of objections concerning the invalidation of the '635 patent [4]. His argument that the publications are not prior art borders on the frivolous, since the Alan and Westerfield article and the Stalcup were published about eight years before Constant applied for his patent, and Constant has admitted that he read the Springer article before conceiving the invention. Appellant also argues that the anticipating references lack various elements of his claimed invention. A claim is anticipated only if each and every element *as set forth in the claim* is found, either expressly or inherently described, in a single prior art reference. *Kalman v. Kimberly Clark Corp.*, 713 F.2d 760, 771, 218 USPQ 781, 789 (Fed.Cir. 1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984). Constant points to a number of features of his invention which he says are not found in the anticipating references. For example, he argues that the random access memory in the claims was defined and must be understood to be a "semiconductor RAM with $log_2n$ address lines connecting the RAM through a decoder." The Allen and Westerfield article and Stalcup patent both use magnetic core memories instead of semiconductors. The court found that magnetic core memory is a type of RAM. The limitations on which the appellant relies (i.e., semiconductor, $log_2n$ address lines, connection through a decoder) are not stated in the claims. Other limitations that he

tries to read from the specifications into the claims are also absent from the claims (with the exception of the multiplier, discussed below). It is the claims that define the claimed invention. *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1053, 5 USPQ2d 1434, 1440 (Fed.Cir.1988). And it is claims, not specifications, that are anticipated. Although the embodiments in the specification involve semiconductor RAMs and $\log_2 n$ address lines, these limitations are not found anywhere in the claims. Appellant is apparently invoking his rights as an inventor to be his own lexicographer, arguing that he defined random access memory in the specification in a way that requires these limitations to be read into the term. Although a patentee may be his own lexicographer, the patent specification must support his asserted definition. *Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 632, 3 USPQ2d 1109, 1113 (Fed.Cir. 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 751, 98 L.Ed.2d 764 (1988). Constant did not explicitly define terms anywhere in the specification in ways that support his current assertions. The text does not implicitly suggest that the words should be interpreted to convey the restricted interpretation that he now asserts. Rather, the patent states that the random access memory "may be any one of a number of types, the exact type to be determined by the application." Col. 4, lines 15–17.

■ Appellant misinterprets the principle that claims are interpreted in the light of the specification. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867, 228 USPQ 90, 93 (Fed.Cir.1985). Although the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims. *Id.; SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121, 227 USPQ 577, 585 (Fed. Cir.1985) (in banc); *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574, 225 USPQ 236, 239 (Fed.Cir.1985); *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1568, 219 USPQ 1137, 1139 (Fed.Cir.1983); *Arshal v. United States*, 621 F.2d 421, 428, 223 Ct.Cl. 179, 208 USPQ 397, 404 (1980). Constant's

asserted limitations concerning semiconductor RAMs and $\log_2 n$ address lines should not be read into the claims. His similar arguments concerning storing of words in a single location in memory, connection of elements as disclosed in the figures and pulse compression also fail for similar reasons. Although these elements are found as examples or embodiments in the specification, they were not claimed explicitly. Nor were the words that are used in the claims defined in the specification to require these limitations. A reading of the specification provides no evidence to indicate that these limitations must be imported into the claims to give meaning to disputed terms.

All of the claims do specify "multiplier means." Constant argues that this element is lacking in the references, which disclose only exclusive-OR gates. However, an exclusive-OR gate is a type of multiplier, and the embodiment of the invention disclosed in the specification explicitly shows an exclusive-OR gate used as a multiplier for comparison of signals in his invention. 35 U.S.C. § 112, Sixth ¶, provides that means-plus-function language in a claim shall be construed to cover the structure described in the specification and equivalents thereof. Thus, "multiplier means" must be construed to cover the exclusive-OR gates in Allen and Westerfield, and the comparator in the Stalcup patent can reasonably be classified an equivalent thereof. There is no error in the district court's decision that the specified claims were anticipated and are therefore invalid.

■ In objecting to the finding of the obviousness of all claims, appellant protests that the court did not consider the prior art that was before the examiner in the Patent Office and complains that the anticipating references have not been shown to be more pertinent than the prior art that was considered by the examiner. There is no legal authority for the view that the court must first determine that prior art in an evaluation of obviousness is more pertinent than the prior art con-

sidered by the PTO.[6] It is, of course, self-evident that any reference that fully anticipates claims of the patent or that was the source of ideas used by the inventor when he conceived his invention is relevant and can be considered on the issue of obviousness. If an invention would have been obvious in the light of certain prior art references, it is irrelevant that it would not have been obvious from other references.

Appellant protests that the court failed to consider objective indicia of nonobviousness as required by *Graham*, which must always be considered when available. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d at 1538, 218 USPQ at 879. However, most of his purported evidence consisted only of argument and conclusory statements rather than factual evidence. Thus he has failed to meet his burden to produce specific facts showing that on this issue there is a genuine issue of material fact for trial. Fed.R.Civ.P. 56(e). *See Sweats Fashions*, 833 F.2d at 1562–63, 4 USPQ2d 1793 at 1795–96.

Obviousness is a question of law based on factual inquiries. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1568, 1 USPQ2d 1593, 1597 (Fed.Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987); *Loctite*, 781 F.2d at 872, 228 USPQ at 97. This court can thus review a determination of obviousness for legal error. Even if we were to give the appellant the benefit of the doubt concerning his asserted objective indicia of non-obviousness, in the context of this motion for summary judgment, we would find no error. Appellees have established a strong prima facie case of obviousness that would not be overcome by the particular objective considerations advanced by the appellant. Thus, Constant's purported objective evidence of nonobviousness does not pose a genuine issue of material fact that would preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## VII. *Other Issues*

Appellant has raised other issues on appeal concerning rulings of the district court on evidentiary matters [7], discovery and joinder [9]. We have examined the rulings of the district court on these matters and find no legal error. In addition, if there had been any legal errors in these rulings, they would have been harmless error that would not justify reversal. 28 U.S.C. § 2111.

Appellant has had an extensive opportunity to litigate his claims. The district court went to great lengths to be fair and has shown great patience in the face of arguments and tactics that would have been improper if advanced by a lawyer. Two federal courts have now fully and fairly considered appellant's claims and determined that the '491 and '635 patents are invalid and that his various other claims are without merit. In the past the appellant has repeatedly attempted to reassert or revive claims and theories after they have been properly dismissed with prejudice by the district court. Appellant is hereby cautioned that if he persists by trying to raise again the same issues that have been finally decided by the district court or by this court, he could be sanctioned under Fed.R.Civ.P. 11, Fed.R.App.P. 38, and the inherent power of the courts to sanction. *Alyeska Pipeline Serv. Co. v. Wilderness Soc.*, 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975); *see Urban v. United Nations*, 768 F.2d 1497 (D.C.Cir.1985).

AFFIRMED.

---

**6.** This notion appears to have been borrowed from the case law on the duty of candor before the PTO, where a patentee is obligated to call to the attention of the PTO references more pertinent than those already known to the examiner. Any relevant evidence, whether more or less pertinent, can be considered in an analysis of obviousness.